CHERUB, The (RICH v.). See Case No. 11,-756.

## Case No. 2,642.

### The CHESAPEAKE.

[1 Ben. 23.][1]

District Court, E. D. New York. Feb., 1866.[2]

COLLISION IN THE EAST RIVER — VESSELS CROSSING—PLEADING—MOVEMENT IN IMMINENT DANGER.

1. Where a propeller coming down the East river had a ferry-boat, which was crossing from New York to Brooklyn, on her starboard hand, and the ferry-boat kept her course, as was admitted by the answer—Held, that under articles 14, 16 and 18 of the rules of navigation, the propeller would be liable for a collision under such circumstances.

2. That the effort on behalf of the propeller to make out a special case under article 19 was not only inconsistent with her answer, but was not sustained on the evidence.

3. That under the circumstances it would have been prudent for the propeller to have ported her helm and gone under the ferry-boat's stern, whereas she did attempt to cross her bows, and that having selected the most hazardous of two courses open to her, she must be held responsible for its failure of success.

4. That the excuse that the ferry-boat stopped her wheels and so led the propeller to starboard, is not made out.

5. That the fact that the propeller, as she neared the ferry-boat, blew two whistles and received two whistles in reply, does not alter the case. The two whistles in reply would amount to nothing more than an indication that the ferry-boat acquiesced in the right so claimed by the propeller to select her own method of avoiding the former. Moreover, the danger was then imminent.

B. D. Silliman, for libelants.
John E. Parsons, for claimants.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 2,643.]

BENEDICT, District Judge. This is a case of collision between the ferry-boat Manhasset, which was crossing the East river from New York to Brooklyn, and the propeller Chesapeake, which was passing through the East river, on her way to Fort Lafayette, on the 2d of December, 1864. The law applicable to the case, is to be found in the rules and regulations for preventing collisions, adopted by the act of congress of April 29, 1864 [13 Stat. 58]. By these regulations it is declared to be the duty of a steamer, which, when crossing so as to involve risk of collision, has the approaching vessel on her own starboard side, to keep out of the way of such approaching vessel, and the duty of the steamer so approaching, to keep her course. Articles 14, 18, Act April 29, 1864. Judged by this rule, the case as stated in the answer of the propeller would seem to be in favor of the ferry-boat; for the answer, while it admits that the ferry-boat was crossing, and the propeller coming down the river, the ferry-boat being on the starboard side of the propeller, also admits that the ferry-boat kept her course, and that the propeller, while attempting to cross her bows, struck her amidships on the port side. No fact is put forth in this answer as tending to take the case out of the general rule; and the fault it charges upon the ferry-boat is, in not changing her course and passing under the stern of the propeller. Upon such an answer, if it stood alone, the libellants would be entitled to a decree. As presented to the court upon the evidence, the case differs from that disclosed in the answer, in this, that special circumstances are claimed by the respondents to have been shown, which rendered a departure from the general rule, as laid down in articles 14, 16, and 18, necessary and justifiable under the proviso of article 19 of the same act.

This claim to have the case considered a special one rests upon evidence tending to show that a sloop and schooner were beating down the river on the New York side, between the propeller and the ferry-boat, rendering it impossible for the propeller to pass to the right and so allow the ferry-boat to keep her course, while the presence of another vessel coming down the river behind the propeller, is relied upon as showing that it was impossible for her to stop and back sooner than she did.

With regard to this evidence, introduced by the respondents without objection on the part of the libellants, for the purpose of making out a special case within the meaning of article 19, it is to be noticed that it is inconsistent with the answer. The theory of the answer is, that it was possible for the ferry-boat, and accordingly her duty, to have starboarded her helm, and so passed between the propeller and the New York shore; but if, as now contended, the presence of a sloop and schooner, beating down between the propeller and the ferry-boat, rendered it impossible

for the propeller to port, it must have been, for the same reason, impossible for the ferry-boat to starboard; and as to the impossibility of stopping and backing, the answer nowhere avers such impossibility, but rather implies the intention on the part of the propeller to avoid the ferry-boat by keeping on.

The theory, then, advanced upon the trial, and based upon these special circumstances, might well be rejected as irreconcilable with the averments of the answer.

It is not, however, intended to rest the decision here upon a question of pleading, but to consider the whole case as disclosed in the evidence. With this view I have carefully examined the testimony relied upon as showing that the propeller was prevented from porting by the presence of other vessels, and while I find positive evidence that a sloop and schooner were beating down the river at the time in question, I also find evidence which satisfies me that these vessels were not in a position to interfere with the propeller in any attempt she might have made to pass under the stern of the ferry-boat. The controlling evidence upon this point is found in the testimony of the master of the propeller. This witness, who was at the wheel, directing the navigation of his vessel, states that when he saw the sloop and schooner he was just below Jackson street; that he starboarded his helm in order to clear them, and "held his sheer long enough to get by them;" that he "then ported the wheel, so as to steady the vessel," and "kept his course right down at full speed." He also says that he saw the ferry-boat when "in the act of passing the sloop and schooner," and not before. Now the fact stated by this witness that after he saw the ferry-boat, and when on a sheer towards the Brooklyn shore, he ported his wheel and steadied his vessel on a course right down the river, renders it highly improbable that the ferry-boat was then approaching on his starboard side, within any short distance. Had the ferry-boat, sloop, and schooner been so near each other as to render it necessary for him to pass across and near to the bows of the ferry-boat, as well as the bows of the sloop and schooner, he would not have ported his helm when he did. The manoeuvre, of itself, shows that the sloop and schooner, when passed by the propeller, were a sufficient distance above the ferry-boat, to have enabled the propeller to pass between them in safety and under the stern of the ferry-boat.

Other evidence in the case confirms this conclusion. Thus the master states that when he first saw the ferry-boat—which was when he was passing the sloop and schooner—he was probably three hundred yards from her, and that in going that distance in that tide he could sheer his vessel eight points. Of course, then, he had room to pass the stern of a vessel which, with helm hard a starboard, he only reached to strike amidships. The second mate of the steamer estimated this

distance at 800 yards, and put the sloop and schooner 1,000 yards distant, approaching at right angles; while another witness introduced by the respondents, and who was standing upon pier 39, stated that he saw no vessels near enough to interfere with the movements of the propeller and ferry-boat. The testimony, then, of the respondents' witness—confirmed, as it is, by several witnesses produced by the libellants—clearly disposes of the allegation that the propeller was prevented by other vessels from passing to the stern of the ferry-boat.

So also the evidence fails to support the allegation that the presence of other vessels under the stern of the propeller rendered necessary a departure from the general rule requiring every steamship, when approaching another so as to involve risk of collision, to slacken her speed, or, if necessary, to stop and reverse. It would appear that there were some vessels passing down the Brooklyn side; but the fact that the last sharp sheer of the propeller to the Brooklyn shore compelled these vessels to back hard to avoid her, shows that before that sheer the propeller could have stopped without interfering with them. And, besides, if any vessels were following the propeller, it is to be presumed that they were being managed in view of the rule (article 17, Regulations of 1864), which casts upon a vessel following, the responsibility of avoiding the vessel ahead, and were therefore prepared for any stoppage, or other necessary manoeuvre on the part of the propeller.

As I view the case, then, it cannot be considered as a special one within the meaning of the proviso of article 19, of the act of 1864, but must be treated as a case of two steam vessels meeting under ordinary circumstances, and governed by the general rule.

Accordingly, the burden is upon the propeller, to show that she adopted timely and prudent measures to avoid the ferry-boat, which failed of success by reason of some fault on the part of the ferry-boat. This the propeller has failed to do. The prudent measure under the circumstances, was to port her helm and go under the stern of the ferry-boat. She attempted to pass her bows; and having selected the most hazardous of two courses open to her, she must be held responsible for its failure of success. But it is said, "the ferry-boat stopped her wheels and so led the propeller to starboard her helm as the proper consequent manoeuvre, and after she had starboarded, it was too late to again change upon seeing the wheels of the ferry-boat start." This excuse, which is not to be found in the answer, is without foundation in the evidence. The testimony of the pilot and engineer of the ferry-boat, which agrees in this respect with the answer of the propeller, shows that the wheels of the ferry-boat were stopped, but instantly put in motion again without affecting in any considerable degree the headway of the vessel; while the testimony of the master and mate of the propeller is positive that no change was made in the course of the propeller by reason of this momentary stopping of the ferry-boat's wheels. These two witnesses agree in the statement that the propeller kept on her course down the river until the wheels of the ferry-boat started, and that it was after the wheels of the ferry-boat were seen to start that the helm of the propeller was put astarboard. Upon the evidence, then, the stopping of the wheels of the ferry-boat cannot avail to excuse the propeller for starboarding instead of porting her helm.

Considerable stress was laid by the respondents upon evidence tending to show that the propeller, "as she neared the ferry-boat, blew two whistles as a signal that she desired to continue her course," and received two whistles in reply from the ferry-boat; but I do not see how this fact, if it were clearly proved, would, in view of the other facts of this case, materially change the aspect of the defense. Two whistles in reply, from a vessel crossing as the ferry-boat was, would amount to nothing more than an indication that she acquiesced in the right so claimed by the propeller, and given her by the law, to select her own method of avoiding the ferry-boat; and it is not shown that at the time of the alleged reply of the ferry-boat, any change of course was made in either vessel.

Moreover, to these whistles, as also to the starting of the wheels of the ferry-boat, the remark applies that the danger was then imminent. The master of the propeller says he rang his four bells in as quick succession as possible, and as soon as he saw the wheels start, and yet he struck the ferry-boat just as his engine began to work back. No mistake committed by the ferry-boat at this late moment would excuse the propeller for placing the vessel in a position of such peril. The duty to avoid the ferry-boat was upon the propeller from the time the ferry-boat was seen to be crossing on her starboard side; and yet, according to the testimony of her own principal officers, the propeller steadied herself on a course right down the river and across the track of the ferry-boat, and held that course, without change and at full speed, until so near that a collision was imminent, when she for the first time changed her helm and then put it to starboard.

Upon her own showing, there appears to me to have been an absence of that care and skill in the management of the propeller, which the law requires of a steamship when crossing the track of another, and I cannot doubt but that she should be held responsible for the damages that ensued.

Let the decree be for the libellants, with an order of reference to ascertain the amount of damages.

This case was affirmed by the circuit court on appeal. [Case No. 2,643.]